We'll hear Police and Fire Retirement System of the City of Detroit v. La Quinta Holdings, Inc. The record will reflect that James Hayworth is present for the appellee, J.P. Morgan, in the event that the panel has any questions for him. Andrew McNeila, P.A. May it please the Court, my name is Andrew McNeila and I represent the Police and Fire Retirement System of the City of New York. Now the sole basis for the District Court's dismissal order was that the plaintiff purportedly failed to plead any false or misleading statements. This Court should reverse because that decision... It was of the City of Detroit. I'm sorry, what was that? It was of the City of Detroit. It is of the City of Detroit, I'm sorry, Police and Fire Retirement System of the City of Detroit. Detail, detail. I know, it's already slipping, right? But the Court should reverse the lower court's decision because it repeatedly misconstrued both the disclosures at issue, the plaintiff's allegations in the case, and drew all inferences in the defendant's favor contrary to the controlling pleading standard. For example, during the class period, L.Q. stressed that timely renovations were critical to its continued success and that it made these renovations on an as-needed basis. Those statements were misleading. In fact, L.Q. did not make renovations on an as-needed rose, but instead allowed a significant number of its properties to fall into a state of significant disrepair. And this hidden risk ultimately materialized when L.Q. announced that it needed to play catch-up and institute an accelerated renovation program at the cost of an additional $120 million over what it had ordinarily budgeted for repairs. Nonetheless, the district court reasoned that L.Q.'s investors were not misled because the company disclosed that it made so-called cyclical renovations every three years and because this accelerated renovation program purportedly was part of those cyclical renovations. Wouldn't that enhance the value of their properties? If they invested $60 million in renovation, presumably it would help them attract business. Of course, the expenditure of resources and capital improvements is something that any company has to do, whether it's in the lodging industry or manufacturing. You've got to maintain your machines. The issue is, though, is whether or not those additional expenditures are expected by the investing populace based on your representations as to how you carry out the maintenance of your properties. And here, as I was saying, you have a company telling folks that we fix our properties on a timely, as-needed basis. But then, all of a sudden, it announces, in addition to the normal expenditures, we have to now spend an additional $120 million to play catch-up because, essentially, we have a bunch of— It's been two years, but my impression was, you could correct me, that they were spending significant—to me, a little kid from Brooklyn—significant amounts of money. Sure, but that's— I mean, it was like $100 million, wasn't it, in change? Right. Each year, so they decide over a two-year period that they have to spend, what is it, $60 million a year more for the next two years? And that's—there's some sort of a fraud there. Correct. Because, again, you've got to remember the issue here is whether or not their statements as to how they carried out the renovation policy was misleadingly stated. And the whole reason why they needed to— But what says that they weren't? I mean, I take it your complaint references a couple of managers or executives that their particular hotels weren't maintained very well. Right. How does that support an inference that the company has been following a policy of deferred maintenance that really doesn't come anywhere near—that doesn't validate the idea that they make renovations when they think they need to? Well, two points in relation to that, Your Honor. First, the very nature of the materialized risk that came to light, the accelerated renovation program itself by its very terms is powerful evidence of the fact— Why? If you choose to spend more, and here we're talking about—it's $60 million over how many years? It's $120 million over two years. Okay, so it's $60 million a year. So that's a significant increase. Right. It is a significant increase. Debating about the money and to the point Your Honor made about they already spend some money, that comes down to an issue of materiality, which was not a basis for the court's finding. And, you know, again, if you say to— No, but what you're saying is it was a false or misleading statement to say part of our work is improving our facilities as needed, and that's misleading inherently, essentially, because they decided at some point to spend more money because they thought it was needed at that point. And then the question becomes, well, why did they do it? To address Your Honor's point directly. And the reason they did it, they had to do it, was because they allowed their properties to fall into a significant state of disrepair. They weren't making the renovations on an as-needed basis. And in Iowa Public Employees Retirement System versus MF Global, this court held that given the nature of the problem at issue, it is reasonable to infer that it substantially predated its announcement. And here they've admitted that their standard practice, right, the practice they claim was sufficient, right, was typically 25 to 30 hotels a year are going to be renovated. Then out of the blue they say, you know what, we realize now we need to increase that for the next two years from 25 to 30 to 80, right, and hotels we weren't going to touch for two years out. Remember, they're talking about taking hotels from two years out and accelerating their renovations now. Well, why are they doing that? Well, they said because we can't be competitive. We're facing competitive pressures. Yes, but why would it – what's in the record before the district judge that suggests that La Quinta must have known and failed to disclose that these hotels needed these renovations? Sure. Well, Your Honor, on page JA846 to 847 of the appendix, which is the 2014 Form 10-K. Hold on a second. Sure. What's the page? It's JA846 over to 847. I'm sorry. No, that's the – that is – no, that's an incorrect page site. We'll get it from the brief. But essentially what the – I'll find it. It's all right. You can – Well, what they basically said was that they evaluated their hotels on an ongoing basis. Management said it evaluated its hotels on an ongoing basis to determine whether or not they needed improvements. Management also claimed that they monitored real-time daily occupancy and pricing data for the rooms, right? So they would have been aware based on their own admissions in addition to the confidential witnesses who discussed the fact that the hotels were falling into a state of disrepair from the outset of the class period. Again, it's pretty clear what happened here. They did not fix – they had a set budget where they were going to fix about 25 to 30 hotels a year, and they kicked the can down the road even though they were telling investors we're fixing these things on an as-needed basis. By kicking the can down on a road, you got a big choke in the snake, right? You got a clog in the pipeline. They wake up one day, and they finally come to the realization, although they knew this was going to happen, right, we can't compete with our competitors who are actually maintaining their properties in timely fashion. So hotels that we weren't going to put out, we weren't going to touch for two years, we need to do accelerated renovations now and basically triple the amount of renovations we do on a yearly basis for the next two years. That is a sharp break from its prior practice. They admitted they were going from about 25 to 30 hotels a year to about 80 and spending an additional $120 million on top of what the investing public believed was going to be their base expenditures. So the question here is whether a reasonable investor hearing LeQuint to say we renovate our properties in a timely and as-needed basis would understand that to mean that all of a sudden we're going to have to add an additional 120 hotels on top of the 30 to 60 over two years we would normally renovate. Good afternoon, Your Honors, and may it please the Court. Jonathan Youngwood for the defendants other than Mr. Goldberg, who is separately represented. Your Honor, I'll get to renovations in a moment since it was the focus of appellant's argument, but there are four alleged categories of misrepresentations. The oil prices, the renovations, the call center, and the hotel sales. What they have in common is a complaint that is based on if a company announces news that may be bad or interesting or in some way material news at one date, it must have been known at an earlier date. And that's a false premise. That's a false argument that doesn't form the basis of an alleged fraud or a 33 Act claim. The second theme that runs through much of this is to get to those assumptions, and we've pointed out instances in our brief, and frankly there were more of them before the district court. There is selective quotation, often frankly with significant creative use of ellipses, to make a point about a statement that's made on one call that read and read in full context as the district court did, simply wasn't made. And the third theme that covers most of these four areas is the reliance on five confidential witnesses who at best are offering anecdotes about individual hotels at a company that owned or franchised roughly 867 during the relevant time period. And so the experience at one hotel or two or three hotels can hardly indicate what the state of the whole company is. Going to the renovations, I think the questions were right on. There is nothing in the record to show, for example, that a decision had been made three, four, five, six or a year earlier that the hotels were in need of additional renovation. In fact, it is clear from the record, and I'll refer the court to the third quarter 2015 analyst call transcript, which is in October of 2015, so several months before the February disclosure of the two times 60 year additional investment, that the company was thinking about additional renovations. And in that call, Mr. Klein, the then CEO, said, among other things, so as we think about it, we are talking, we're taking a look at potential investment alternatives into all of these areas. But we will assess and discuss more on our year's end earnings call, certainly with a keen focus on those items that will accelerate long term growth. So you actually have a company, not one that's hiding the state of its hotels, and our brief is full of citations to the exact age of these hotels, to the amount of money that historically have been put into renovations, to the occasional other accelerated renovation programs. This was not the first time this company had done that during the time period discussed in the complaint or in the briefing or in the public disclosures. But then a company that, as it's looking in the competitive environment, and considering what it's going to do, having not yet decided, there is no allegations that the company decided, for example, in October, to announce spending more money in February. It is completely transparent with its investors, with the public, with the analysts, and it's saying, these are things we're thinking about, we'll talk to you more about it at year end, and that's exactly what they did. They announced a two-year program that, yes, $60 million is a lot of money. It's more than the hundred that they had typically spent because it was on top of that. Yes, it's accelerated, but it was done for reasons dealing with competition that the company, the CEO, were completely transparent with the market about. His argument is that the reason for this was because you were deferring making timely improvements in the properties, and that resulted in a sudden increase in the amount that you were spending. That's what I understand his argument to be. I agree that that's the argument, Your Honor. I think two answers to it. One, the state of the hotels was disclosed in detail, frankly, at almost every periodic quarterly update in the 8K and on prior earnings calls. The market knew that the owned hotels were 27 years old on average, for example. The market knew that spending the appropriate amount of money on renovations was, of course, in the hotel industry relevant to the performance of the hotels. The basis, though, for this backlog, for this need, at most, comes down to these five confidential witnesses, four of whom were simply general managers of one hotel at a time. So, again, in a collection of 857 or 867, I apologize, hotels at the relevant time, you have a small handful, maybe less than a dozen hotels being talked about by these at least four who were the former general managers of select hotels in select geographic regions. Some of them, not all, some of them say, the hotel I worked at needed repairs, but with, I think, the exception of one of them, maybe two, none of them even attribute a change in business to that. And none of them are in a position, frankly, because they are only at the general manager at the individual property level, to judge, is this in the proper time frame to renovate? The district court cited to three years is a typical cycle. I believe the court was referring to the franchise cycle. The owned property cycle was typically longer. It was seven. But none of these individual managers speak to or necessarily had the perspective, because it appears that most of them from the allegations were relatively short-term employed, to know where in the cycle the hotel they happened to work at was. You can't renovate all your properties at the same time. So I think the short answer to your question is it's definitely their argument, but it's not an argument that's supported by any non-conclusory allegations, including by any, frankly, of their five confidential witnesses. Mr. Youngblood, the parties appear to agree that the district court erred in its discussion of the cycle of renovation. I take it your view is that this error was not central to the district court's holding, or it's not nothing that we should be concerned about? To the extent the district court wrote that all of the properties had a three-year cycle, that was a mistake. But the franchise properties did typically have a three-year cycle, or at least it was three years on average. I think cycle is probably not quite the right word. The owned properties had seven, but I'm not sure it matters if it's three or seven, or frankly if it's anything at all. You still, to get to the heart of their argument, would need credible allegations, non-conclusory allegations, that it was somehow known that there was significant backlog in the renovations. Why wouldn't discovery be helpful in a situation like this? This was done on 12b6, right? Yes, sir. Yes, Your Honor. It was done on 12b6. Because you don't get discovery just because you have a theory or a wish, Your Honor. You need to have credible allegations, and they did their job. This case has a fairly long procedural history before the district court. There was a plaintiff appointment process after that. They did their research. They hired their investigator. That's how they got their five CWs. They filed a full complaint, very detailed in the sense of at least length. I think the details are somewhat lacking on some of these key points. We moved to dismiss, and under the district court's practices and rules, she then gave them the opportunity to replead, which they did. We moved to dismiss again, and after all of that, really, depending on how you count, two or three complete complaints, she dismissed. That's fine. Thanks very much. Thank you, Your Honors. Ms. Rodgers for Mr. Goldberg. Thank you, Your Honor. May it please the court, I'm Sarah Rodgers, and I'm here on behalf of Appellee Wayne Goldberg. Mr. Goldberg adopts the arguments of the other appellees set forth today and in briefing, and we just additionally want to underscore a few key points why the complaints allegations are especially implausible and it's dismissal merited with respect to Mr. Goldberg. Now, since we've been on the topic of renovations, one of the key instances of purported misstatements and omissions that the complaint identifies on the renovations topic is the November 2015 earnings call. Of course, Mr. Goldberg had departed La Quinta in September 2015. He can't be liable for anything that occurred in any statements or omissions in November 2015. I'm sorry, what was the gap between his resignation and... It was about two months. He left September 17th, and I can't recall the exact date of the November earnings call, but he wasn't there. Are the specific misstatements attributed to Mr. Goldberg or any of those about the renovation issue? I believe it's mostly omissions that are attributed to Mr. Goldberg with respect to... And those are with respect to, but there are some with respect to renovations. Yes, and I think with respect to renovations, oil, the sale of the Oklahoma City property, the bottom line is that... Those other things got demoted from their position in the complaint in the brief, and then they got sort of demoted again at oral argument. I was focused mostly on the... Mr. Goldberg is, though, implicated in allegations that are about the renovation issue. He's purportedly implicated. Of course, I think the bottom line is that even arguendo, even if they could adequately allege material misstatements or omissions of fact with respect to renovations or any other topic, with respect to Mr. Goldberg, they would still need to plead scienter. That's obviously, it's an alternative ground. Judge Nathan didn't even get there. But the reason Mr. Goldberg stands here separately before you today is just to underscore that the complaint allegations don't support an inference of scienter. They actually contradict such an inference. Mr. Goldberg's own sales of La Quinta stock, if you ignore the tax withholding transaction scheduled under his 10B5 plan, occurred at the very outset of the putative class period before any of these purported misrepresentations or omissions, with the sole exception of the November 2014 SPO prospectus. Why did Mr. Goldberg resign as CEO? Mr. Goldberg's resignation as CEO happened for a variety of reasons, but what's crucial is that plaintiffs, plaintiff, I'm sorry, did not identify any facts or circumstances that would give rise to an inference that this was unusual or that it was for a reason that would support the allegations in their complaint. It does not support an inference of scienter. There's nothing in the record that would, in your view, that would support that supposition. Precisely. Thanks very much. Thank you. Thank you, Your Honor. I have quite a bit of topics to discover here. First, on the last question you just raised about whether the resignation led to an inference of scienter, the record's pretty clear. Defendant Goldberg resigned the same day that La Quinta had to restate its guidance for the third time in one year, and shortly after he resigned is one of all these revelations with respect to all these additional renovations being needed, and I'll get to the oil because I want to focus on the oil as well because that's the other primary group of misstatements. So, again, you have a situation, three times in one year they have to adjust their guidance. He gets fired the same day they're announcing they're adjusting their guidance again, the third time, and then about a month after he resigns, all these revelations about the need for additional renovations and the true impacts of oil on their business that they had been misleading the general public to. Can I ask you, Judge Nathan said that the plaintiff never identifies a specific duty or obligation requiring La Quinta to disclose its need for renovations. Sure, and as we point out in our brief... Could you address that? Was she right? No. Respectfully to the district court, as we point out in our brief, literally every single step of her analysis on the renovations issues was just incorrect. The law is clear that when you choose to speak on a topic, you are under an obligation now to speak fully and truthfully on that topic. But which topic did they speak on that didn't make the disclosure? Right. Their claims that they made their renovations on a timely basis and did so as the need arises, and I don't want to... I want to switch to the oil unless you have any further questions about the renovations other than the very nature of the program itself shows that they had been kicking the can down the road. On oil, which we haven't discussed before, La Quinta routinely made false statements regarding the impact of lower oil prices on its key Texas market. For example, and I think this is a very big one, in its 2014 prospectus for its SPO, which was issued in November of 2014, the company talks about how Texas is 25% of its business, how it's sensitive to local economic issues, how oil sensitivity is there. They didn't say, however, at the time when they're trying to solicit investors, by the way, our earnings from our oil and gas related business in Texas for 2013 and 2014 was anomalous. It was overstated, their own words. It was ahistorical, right? They didn't say it was overstated means you said something that wasn't true about what the business was. What they're saying is those were very good years, and now there's been a decline. That's what they said. Well, they didn't say there was a decline in 2014 in their SPO. They didn't say anything. They just said that generally they're sensitive. They said that when they used the word about ahistorical, they were responding to a comparison of last year versus this year or this period versus that period, and they said the new numbers are a return to the historical figures. The other year was a very good year. Absolutely, and then the question arises, and as we've posited, the answer is quite clear under the law. You can't talk about oil and sensitivity to oil and the fact that oil can impact your performance, yet when you're running out there soliciting investors and you know that the financials that you're including in those documents are abnormal compared to your performance in prior years. Doesn't the world know what their performance was in prior years? They don't know it has anything to do with oil is the whole point. They say in the prospectus that their business is concentrated in Texas, their business is sensitive to the local industries and the local economy, and any idiot knows that oil is a big deal in Texas. So what is it that they didn't say? They didn't say. And everybody knows when the boom years are and when the bust years are in oil prices. So what is it that the investor is hidden from the investor about the fact that in 25 percent, not even 25 percent of their business, that portion of the 25 percent that's in the oil regions of Texas is going to be affected when the oil price plummets? Your Honor, no, not everybody knows that, and that's why the law provides a requirement that when you're going to speak about, for example, your oil sensitivity, you can't then eight months, nine months, ten months after you get all these people to buy your business say, ha-ha, guess what, you know, you bought our stock based on this financial. If you bought the stock because you're going to try and flip it in two days, maybe. But if you're buying stock in a company that has 25 percent of its business in Texas and you're told that there's oil sensitivity, you don't know that there are going to be good years and bad years, and you can't tell when the good years and bad years are coming just by watching the prices at the pump and by watching the evening news and finding out that oil prices worldwide are either going up or down? Well, quite clearly not, Your Honor, especially when the company itself is repeatedly stating that the decline in oil prices is not having a material impact on its overall business. Right, because overall, even in Texas, their, what do you call it, occupancy rate went up by a little bit overall, and for the whole country, it went up by a lot. Right, and you have to look at what they said. So they said, for example, during the first quarter of 2015 that Texas, they came out and they said, hey, look, every comment they made was to downplay the effect. There's a little bit of softening here. We're having a little bit of impacts. But then 10 months later, they came out and said – But it's outweighed by what's going on in the rest of the country where lower gas prices means more leisure travel, means more people staying at our hotels. And knowing the importance of the Texas market, what did Defendant Goldberg say at that point? He said, we are performing very strong in Texas. Guess what? Ten months later, they reveal our most important market is performing at less than half the rate of the rest of the country. Half the rate of the rest of the country, but it was up by half the rate of the rest of the country. But it was below where their overall guidance was, and being up is irrelevant. If your investors believe you're going to be up by 20% and you're only up by 10%, your stock is going to crash. So it is relative. It depends on the situation. And when a reasonable investor, thinking about the most important market, and they're saying, despite all this news, right, that oil is coming down, that this is not having any material impact on us at all. Everything is peachy keen. We're performing very strong. We don't have any disproportionate revenues coming from our oil and gas business. Every one of those statements was flat-out false. We knew they were getting disproportionate revenues from the oil and gas business. That's a misstatement Klein made. We knew that they were performing, ten months later when they admitted it, less than half as well as the rest of the country, and that only accelerated into the second quarter at the same time that they're repeating their same mantra that this is a tailwind. This is not a headwind. We're doing A-okay. And the data that they eventually, they themselves, said they had at the time they were making their statements proves the falsity of what they said. Thank you. Thank you.